IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID LANE BYRNS,<br>[DOB 9/19/57]<br><br>    Defendant. | No. 5:19-cr-06011-SJ-DGK<br><br>**COUNT ONE**<br>*Conspiracy to Commit Health Care Fraud*<br>18 U.S.C. § 1349<br>NMT 10 Years Imprisonment<br>NMT $250,000 Fine<br>NMT 3Years Supervised Release<br>Class C Felony<br><br>**Allegation of Criminal Forfeiture**<br>18 U.S.C. § 982(a)(7)<br><br>$100 Mandatory Special Assessment on Each Count |

# I N F O R M A T I O N

## COUNT ONE

### General Allegations

At all times material to this Information:

### The Health Insurance Programs

1.    RightCHOICE Managed Care, Inc. (a Missouri-headquartered licensee of the Blue Cross and Blue Shield Association) ("RightCHOICE"), United HealthCare, Inc. ("UHC"), and Aetna Inc. ("Aetna") (collectively, the "Private Insurers") were private insurance companies, and, along with other private insurance companies, offered individual and group health benefit plans and served as third-party administrators for self-insured health plans.

2.    MO HealthNet was Missouri's Medicaid program. MO HealthNet provided benefits to certain low-income individuals and families in Missouri through Home State Health

Plan, Inc. ("Home State"), a Managed Care Organization ("MCO") with which MO HealthNet contracted to administer Missouri Medicaid recipients' health care benefits.

3. The Private Insurers and MO HealthNet were each a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

4. The Private Insurers entered into contracts with health care providers in Missouri, including hospitals, under which the Private Insurers agreed to reimburse providers at negotiated rates for items and services provided to individuals (known as "Members" or "Subscribers") insured under the health insurance plans provided or administered by the Private Insurers. Providers with which the Private Insurers had such contracts were generally referred to as "in-network" providers.

5. Home State also had contracts with health care providers in Missouri, including hospitals, under which it reimbursed for health care items and services provided to eligible Medicaid recipients. MO HealthNet made monthly capitated payments for each Medicaid recipient enrolled with Home State.

6. Laboratory tests could be performed on bodily fluids such as urine and blood to detect recent drug or alcohol use by an individual, or to diagnose various medical conditions. The Private Insurers' contracts with in-network hospitals typically covered medically necessary (as defined in the contracts) urine drug tests ("UDTs") and blood tests performed for patients of the hospitals, and reimbursed these tests at elevated rates in order to ensure that the hospitals could provide care to the surrounding community. The Private Insurers typically did not reimburse out-of-network providers for laboratory testing services, or reimbursed them at lower rates than in-network providers.

### The Hospital

7. Putnam County Memorial Hospital ("Putnam") was a 15-bed, rural hospital, designated as a Critical Access Hospital ("CAH") under the 1997 Balanced Budget Act, located at 1926 Oak Street in Unionville, Missouri, in Putnam County, in the Western District of Missouri. Putnam offered, among others, acute care, outpatient services, specialty clinics, an emergency room, and laboratory services.

8. Putnam had contracts with the Private Insurers, other private health insurers, and Home State, under which those insurers agreed to reimburse Putnam for certain claims submitted by the hospital for healthcare services, including laboratory testing services, performed on behalf of the insurers' Members and Subscribers who were patients of Putnam. Under these contracts, Putnam was an "in-network" provider, and was reimbursed at substantially higher rates than the Private Insurers would reimburse out-of-network providers for performing comparable services.

### The Defendant, Co-Conspirators, and Related Companies

9. Defendant David Lane Byrns ("Byrns") resided in Lighthouse Point, Florida.

10. Hospital Partners, Inc. ("Hospital Partners"), incorporated on or about December 23, 2015, was a Florida corporation with its principal place of business located at 4451 Northeast 27th Avenue, Lighthouse Point, Florida. Byrns and Individual 1 owned, operated, and controlled Hospital Partners.

11. Company A, a Florida corporation, was a medical billing and software business owned, operated, and/or controlled by Individual 1.

12. Company B, a Florida corporation, was a clinical testing laboratory owned, operated, and/or controlled by Individual 2. Company B did not have a reimbursement contract and was "out-of-network" with the Private Insurers.

3

13. Company C, a Florida corporation, was a company owned, operated, and/or controlled by Individual 2.

## Putnam's Laboratory Facilities

14. Between approximately October 2016 and mid-February 2017, Putnam did not have laboratory facilities sufficient to conduct large-scale UDTs.

15. Between approximately December 2016 and February 2018, Putnam did not have laboratory facilities sufficient to conduct large-scale blood testing.

## The Conspiracy

16. From in or around October 2016, and continuing through at least in or around February 2018, in Putnam County, in the Western District of Missouri and elsewhere, the defendant **DAVID L. BYRNS**, did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Individual 1, Individual 2, and others known and unknown to the United States, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Private Insurers and MO HealthNet, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody or control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

17. The purpose of the conspiracy was for Byrns and his co-conspirators to unlawfully enrich themselves by, among other things, (a) submitting and causing the submission of false and fraudulent claims for reimbursement of laboratory testing services, purportedly conducted at

Putnam for Putnam patients, to health care benefit programs, and (b) to divert fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means

18. The manner and means by which Byrns and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

### Byrns and Co-Conspirators Obtain Control over Putnam

19. Byrns and Individual 1 sought to obtain control over financially troubled rural hospitals in order to engage in a fraudulent billing scheme in which UDTs and other bodily fluid testing performed on non-hospital patients and at outside laboratories were billed through the hospitals, using their favorable reimbursement contracts, to private insurance companies.

20. On or about September 12, 2016, Byrns, acting on behalf of Hospital Partners, executed a management agreement (the "Management Agreement") with the Putnam Board of Trustees under which Hospital Partners would manage the day-to-day operations of the hospital. The Management Agreement gave Hospital Partners control over Putnam for a period of approximately eighteen months.

21. On or about September 13, 2016, Byrns was named the Chief Executive Officer (CEO) of Putnam.

22. On or about September 15, 2016, Byrns, acting on behalf of Putnam, and Individual 1, on behalf of Company A, executed an agreement (the "Service Agreement") under which Company A would provide claims processing services for Putnam in return for a fee of 6.5% of "collected revenue," that is, the amounts collected by Putnam from insurers.

23. On or about October 20, 2016, Byrns, acting on behalf of Putnam, and Individual 2, on behalf of Company C, executed an agreement (the "Independent Contractor Agreement")

5

under which Company C would purport to operate a clinical laboratory at Putnam. The Independent Contractor Agreement also provided that Company C would have access to a Putnam bank account into which reimbursements from the Private Insurers and others would be deposited, and would "sweep" the account weekly, with Company C taking 80% of the balance and Putnam retaining 20%. In truth and in fact, Individual 1 and Individual 2 formed Company C, and arranged for it to enter into the Independent Contractor Agreement, as a vehicle for receiving and distributing the proceeds derived from fraudulently billing the Private Insurers and others, through Putnam, for laboratory testing services purportedly performed on behalf of Putnam patients.

24. On or about November 29, 2016, Byrns, acting on behalf of Hospital Partners, executed a lease agreement with the Putnam Board of Trustees under which Hospital Partners had "full authority to conduct, supervise and manage the day-to-day operations of the Hospital."

25. In or about mid-February 2017, following several months of preparation, Byrns, Individual 1, Individual 2 and others caused the laboratory at Putnam to begin conducting some UDTs using testing equipment transferred from Company B's location in Florida.

**Claims for UDTs**

26. Between in or about October 2016 and in or about February 2018, Byrns, Individual 1, Individual 2, and others caused Company B, other out-of-network clinical testing laboratories outside Missouri, and the Putnam laboratory, to perform UDTs for individuals who were not inpatients or outpatients of Putnam, and who otherwise had no connection to Putnam.

27. Byrns, Individual 1, and Individual 2 entered into arrangements with marketers to obtain large quantities of urine samples from substance abuse treatment centers, sober living homes, physicians' offices, and other sources throughout the United States that could be tested by

6

Company B, other out-of-network clinical testing laboratories outside Missouri, and the Putnam laboratory.

28. Between in or about October 2016 and in or about February 2018, Byrns, Individual 1, Individual 2, and others, using Company A, caused the submission of materially false and fraudulent claims for reimbursement, on Putnam's behalf and using Putnam's billing credentials, to the Private Insurers, other insurers, and Home State, for UDTs performed by Company B, other out-of-network clinical testing laboratories outside Missouri, and the Putnam laboratory, in that many of the tests were medically unnecessary and the claims were submitted as if the UDTs were performed at Putnam on behalf of Putnam patients.

**Claims for Blood Testing**

29. Between in or about December 2016 and in or about February 2018, Byrns, Individual 1, Individual 2, and others caused out-of-network clinical testing laboratories outside Missouri to perform blood tests for individuals who were not inpatients or outpatients of Putnam, and who otherwise had no connection to Putnam.

30. Byrns, acting on behalf of Putnam, hired phlebotomists who worked at medical practices throughout the country to facilitate the collection of blood samples to be tested and billed through Putnam.

31. Between in or about December 2016 and in or about February 2018, Byrns, Individual 1, Individual 2, and others, through Company A, caused the submission of materially false and fraudulent claims for reimbursement, on Putnam's behalf and using Putnam's billing credentials, to the Private Insurers and other insurers for the blood tests performed by out-of-network clinical testing laboratories outside Missouri, in that many of the tests were medically

7

unnecessary and the claims were submitted as if the blood tests were performed at Putnam on behalf of Putnam patients.

**Distribution of Fraud Proceeds**

32.  Between in or about October 2016 and in or about February 2018, the Private Insurers and Home State paid at least $114,000,000 to Putnam based on the materially false and fraudulent claims for UDTs and blood tests.

33.  After the Private Insurers, other insurers, and Home State reimbursed Putnam based on the materially false and fraudulent claims for UDTs and blood tests, Byrns, Individual 1, and Individual 2 caused a portion of the proceeds to be transferred to Company C in accordance with the agreed-upon split in the Independent Contractor Agreement. Between in or about November 2016 and in or about February 2018, Byrns and his coconspirators caused at least $63,000,000 in fraudulently-obtained insurance reimbursements to be transferred to Company C.

34.  Byrns, Individual 1, and Individual 2 caused the proceeds received by Company C to be further distributed to Company A, Company B, Hospital Partners, other clinical testing laboratories that had performed UDTs and blood testing billed through Putnam, and marketers that had arranged to procure samples for testing.

35.  Byrns and Individual 1 caused Hospital Partners to transfer to Company A the agreed-upon 6.5 percent fee for all insurance reimbursements that Putnam received as a result of the fraudulent billing, and to transfer additional sums to personal accounts controlled by Byrns and Individual 1.

All in violation of Title 18, United States Code, Section 1349.

# FORFEITURE ALLEGATION
18 U.S.C. § 982(a)(7)

36. Upon conviction of the offense alleged in Count One of this Information, Byrns shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to violations of 18 U.S.C. § 1349, including but not limited to:

**An order of forfeiture** for the full amount of the proceeds the defendant personally obtained from the health care fraud conspiracy (at least $5,100,000).

In addition, the United States seeks forfeiture of the following assets which constitute or are traceable to proceeds:

## Financial Accounts

United States currency, funds and other monetary instruments credited to the following account numbers and up to the following approximate amounts:

| Account | Financial Institution | Account No. | Amount |
|---|---|---|---|
| David L Byrns & spouse's Revocable Trust Yield Pledge Money Market Account | TIAA | x3668 | $1,846,038.89 |
| David L Byrns & spouse's Revocable Trust Yield Pledge Checking Account | TIAA | x2911 | $94,694.98 |

## Real Property

Real property located at 4451 NE 27 Avenue, Lighthouse Point, Florida, 33064, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 4, Block 57, VENETIAN ISLES THIRD SECTION, according to the plat thereof, as recorded in Plat Book 47, Page 13, of the Public Records of Broward County, Florida, for which the defendant's and his spouse's Revocable Trust is the recorded owner.

Real property located at 2611 NE 52 Court, Lighthouse Point, Florida, 33064-7065, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 6, Block 9, of POMPANO WATERWAY ESTATES, according to the plat thereof, as recorded on Plat Book 39, at Page 41, of the Public Records of Broward County, Florida, for which the defendant's daughter is the recorded owner.

Real property located at 1681 SE 4 Court, Deerfield Beach, Florida, 33441, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 23, Block 11, THE COVE, according to the map or plat thereof, as recorded in Plat Book 32, Page 48, Public Records of Broward County, Florida, for which the defendant's daughter is the recorded owner.

Real property located at 1410 SE 14 Avenue, Deerfield Beach, Florida, 33441, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 1, Block 8, of SUNSET EAST, according to the plat thereof as recorded on Plat Book 60, Page 2, Public Records of Broward County, Florida, for which the defendant's son is the recorded owner.

37. If any of the above-described forfeitable property, as a result of any act or omission of Byrns:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or
    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

10

incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of Byrns up to the value of the forfeitable property described above, or to seek return of the property to the jurisdiction of the court so that the property may be seized and forfeited.

All pursuant to the provisions of Title 18, United States Code, Section 982(a)(7) and procedures outlined in Title 21, United States Code, Section 853, and pursuant to Federal Rule of Criminal Procedure 32.2.

        Timothy A. Garrison
        United States Attorney
        Western District of Missouri

By    */s/ Lucinda M. Woolery*

        Lucinda M. Woolery
        Assistant United States Attorney
        Western District of Missouri
        Charles Evans Whittaker Courthouse
        400 East Ninth Street, Suite 5510
        Kansas City, Missouri 64106
        Telephone:  (816) 426-3122

        Robert Zink, Chief
        Criminal Division, Fraud Section
        United States Department of Justice

By:    */s/ Allan Medina*

        Allan Medina
        Acting Deputy Chief
        Criminal Division, Fraud Section

        Gary A. Winters
        James V. Hayes
        Trial Attorneys
        Criminal Division, Fraud Section
        1400 New York Ave., N.W.
        Washington, D.C. 20005
        Telephone:  (202) 598-2382